**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| GARY WALKER, | CIVIL ACTION |
| Plaintiff, | NO. _____ |
| v. | |
| CITY OF PHILADELPHIA, and DETECTIVE FRANK JASTRZEMBSKI, DETECTIVE ARTHUR MEE, DETECTIVE JAMES DOUGHERTY, DETECTIVE MARIA DIBLASI, DETECTIVE EDWARD ROCKS, and DETECTIVE GROEBS, in their individual capacities, | **COMPLAINT** |
| Defendants. | |

Plaintiff, Gary Walker, by and through his attorneys, the Marrone Law Firm, LLC,

hereby alleges as follows:

<u>PRELIMINARY STATEMENT</u>

1.      In July of 2024, after spending more than 28 years in prison for a crime he did not

commit, plaintiff Gary Walker was released from incarceration.  The only evidence in support of

Defendant City of Philadelphia's first-degree murder charge against Mr. Walker was the

testimony of Lorenzo Andrews, whose statement to police and trial testimony were both

contradicted by the undisputed forensic evidence presented by the Commonwealth.

2.      On December 13, 1995, at around 2:17 pm, the Philadelphia Police Department

began receiving calls about a shooting on the 2100 block of N. 7th Street in North Philadelphia

near a barbershop, which resulted in one man on the ground after being shot.  When the police

arrived on the scene, the victim and the shooters were gone.  The area was riddled with bullet

casings, indicating multiple firearms were used at the scene.  Police located the victim, William

Hamlin, at a local hospital. Hamlin was pronounced dead less than an hour after the 911 calls came in. Police also became aware of another victim of the same shooting, who had been shot in his left leg but would survive. That person was Plaintiff Gary Walker.

3.     The police could not figure out what happened right away. With one victim dead and one wounded, they pursued the easiest theory they could to close the case *within 48 hours*. That theory was to pin the blame on Plaintiff for shooting and killing Hamlin. Detectives fabricated a narrative and tried to find a witness to adopt it. They first tried, on the day of the shooting, to coerce one of the employees from the barbershop, Mitchell Pearce, to state that he had witnessed Plaintiff shooting Hamlin at close range. But as Pearce testified at Mr. Walker's murder trial, he did not witness any of the events leading up to the shooting, much less witness a shooting at close range. Instead, using physical force and mental coercion, Detective Mee forced him to sign off on a completely false statement implicating Mr. Walker.

4.     The next day, police were more successful when they found Hamlin's friend Lorenzo Andrews, who conveniently agreed to sign a statement claiming he saw Mr. Walker shoot Hamlin at close range. Andrews willingly testified to that narrative because he himself was responsible for shooting Mr. Walker in the leg, and was upset about his friend dying.

5.     One day later, Detective Jastrzembski, who procured Andrews' concocted statement, swore out an affidavit of probable cause to charge Mr. Walker with the first-degree murder of Hamlin.

6.     What really happened that day is that Mr. Walker paid Hamlin and Andrews $3000 for what he thought was cocaine but turned out to be fake drugs. Mr. Walker immediately went back to find the men in order to get his money back. Some guys on the corner directed him to the barbershop, so he went there and opened the door to the shop. Hamlin and Andrews came

to the door and aimed their guns at him.  Mr. Walker told them and showed them that he was

unarmed, and only wanted to talk.  But he was fearful of them, so he backed out the door, and

retrieved his gun.

7.      Mr. Walker saw Andrews come out of the shop first, followed by Hamlin.

Andrews was talking to a man named Bernie who was in a white Jeep.  Mr. Walker asked

Hamlin to speak with him, and the two walked a few doors down from the shop.  Hamlin was

yelling at him, and Mr. Walker was loudly asking why would they do this to him and to just give

him his money back.  Hamlin said he'd give him half, but Andrews shouted "He don't get shit."

8.      Then Hamlin reached into his jacket and shots began firing.  Mr. Walker ran away

from Hamlin, and started running toward the Jeep.  But Andrews was firing toward him, so he

had to run a different way.  As he was running, he pulled out his weapon and fired it wildly

behind him in an attempt at self-defense.  Then he felt his left leg jerk, followed by burning.

Andrews continued to fire at him.

9.      Eventually, Mr. Walker ended up at St. Joe's hospital to get treatment for his

gunshot wound.

10.     None of the bullets fired by Mr. Walker caused any injury of anyone, including

Hamlin.

11.     Mr. Walker should never have been charged with and prosecuted for first-degree

murder that was based on a false statement that he fired his gun at Hamlin at close range.

12.     Mr. Walker was convicted on July 7, 1997 of murder in the first degree and

possession of an instrument of crime.  The court imposed a sentence of life imprisonment for the

murder conviction.

13.     The wrongful arrest and conviction of Mr. Walker was part of a pattern and practice of the City of Philadelphia, whereby detectives of the PPD Homicide Unit routinely resolved cases by using coerced statements and testimony, as well as fabricated and suppressed evidence.

14.     On September 1, 2023, Mr. Walker's PCRA petition was granted, and his conviction for first-degree murder and accompanying life sentence were vacated.  On that same date, Mr. Walker accepted a negotiated guilty plea to third-degree murder, which carried a sentence of 20 to 40 years.  He was finally able to secure his release from prison in July of 2024.

15.     Mr. Walker now brings this action under 42 U.S.C. § 1983 seeking redress for police misconduct that violated the Plaintiff's constitutional rights and caused him to be incarcerated for more than 28 years.

## JURISDICTION AND VENUE

16.     This action is brought pursuant to 42 U.S. § 1983 to redress the deprivation under color of law of the Plaintiff's rights as secured by the United States Constitution.  This Court has federal question jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343.

17.     This Court has supplemental jurisdiction over the plaintiff's state law claim pursuant to 28 U.S.C. § 1367(a).

18.     Venue is proper in the Eastern District of Pennsylvania under 28 U.S.C. § 1391(b) in that this is the District in which the claims arose.

## JURY DEMAND

4

19.     Plaintiff demands a trial by jury on all issues and claims set forth in this Complaint, pursuant to the Seventh Amendment of the U.S. Constitution and Federal Rule of Civil Procedure 38(b).

## PARTIES

20.     Plaintiff **Gary Walker** is, and at all times relevant to this Complaint was, a resident of Pennsylvania.  Mr. Walker was born on June 11, 1967.  In July of 1997, Mr. Walker was wrongfully convicted of the first-degree murder of William Hamlin and, as a result, served over 28 years in prison.  Only when evidence of the Defendants' wrongful, illegal and unconstitutional conduct and Mr. Walker's innocence came to light years later was there a basis for his original charges, convictions and sentence to be vacated and he was able to be released from prison.

21.     Defendant **City of Philadelphia** is, and at all times relevant to this Complaint was, a municipality located in the State of Pennsylvania.  The City of Philadelphia was, at all times relevant to this Complaint, officially responsible for the policies, practices and customs of the Philadelphia Police Department ("PPD"), and was the employer of the individual PPD Defendants in this matter.

22.     Defendant **Frank Jastrzembski**, at all times relevant to this Complaint, was an officer of the PPD acting under color of law and within the scope of his employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of Philadelphia and the PPD.  He is sued in his individual capacity.  Upon information and belief, Jastrzembski was assigned as a detective with the Homicide Unit at the time of this investigation.

23.     Defendant **Arthur Mee, Badge No. 9199**, at all times relevant to this Complaint, was an officer of the PPD acting under color of law and within the scope of his employment

pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of Philadelphia and the PPD.  He is sued in his individual capacity.  Upon information and belief, Mee was assigned as a detective with the Homicide Unit at the time of this investigation.

24.     Defendant **James Dougherty, Badge No. 842**, at all times relevant to this Complaint, was an officer of the PPD acting under color of law and within the scope of his employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of Philadelphia and the PPD.  He is sued in his individual capacity.  Upon information and belief, Dougherty was assigned as a detective with the Homicide Unit at the time of this investigation.

25.     Defendant **Maria DiBlasi, Badge No. 825**, at all times relevant to this Complaint, was an officer of the PPD acting under color of law and within the scope of her employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of Philadelphia and the PPD.  She is sued in his individual capacity.  Upon information and belief, DiBlasi was assigned as a detective with the Homicide Unit at the time of this investigation.

26.     Defendant **Edward Rocks**, at all times relevant to this Complaint, was an officer of the PPD acting under color of law and within the scope of his employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of Philadelphia and the PPD.  He is sued in his individual capacity.  Upon information and belief, Rocks was assigned as a detective with the Homicide Unit at the time of this investigation.

27.     Defendant **Groebs**, at all times relevant to this Complaint, was an officer of the PPD acting under color of law and within the scope of his employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City of Philadelphia and the PPD.

He is sued in his individual capacity.  Upon information and belief, Groebs was assigned as a detective with the Homicide Unit at the time of this investigation

28.     Defendants Jastrzembski, Mee, Dougherty, DiBlasi, Rocks and Groebs are collectively referred to herein as "Individual Defendants."

29.     At all times relevant to this Complaint, the individual Defendants named above acted in concert and in conspiracy with one another in order to deprive Mr. Walker of his constitutionally protected rights.

## FACTUAL ALLEGATIONS

### The December 13, 1995 Homicide of William "Man" Hamlin

30.     On December 13, 1995, at approximately 2:17 p.m., 911 began receiving multiple calls about several black males who were shooting at each other on the 2100 block of N. 7th Street in North Philadelphia.  One caller said she was witnessing one black male "constantly shooting at" another black male, who was wearing a dark coat and hat, while he ran away from the shooter down 7th St. towards Susquehanna Ave.  Several callers said that they heard multiple shots and saw a man who had been shot lying on the ground on the corner of 7th and Diamond Streets, but did not see any shooting.  That man's name was William "Man" Hamlin.

31.     By the time police arrived to the scene, which was a few doors down from a barbershop, they were told that Hamlin had already been taken to the hospital by bystanders.

32.     The police found the area of 2100 to 2120 N. 7th Street riddled with 24 fired cartridge casings (FCCs) of different calibers.  According to the Commonwealth's ballistics expert at trial, three to five different firearms were used at the scene.

33.     Police began to search local hospitals to find Hamlin.  They received a report of a shooting victim at Girard Medical Center, where police found Hamlin with several gunshot

wounds.  He was transferred to Jefferson Hospital, where he was pronounced dead.  He had sustained three gunshot wounds, one of which was a fatal wound to the left lower back.  Police later determined that Hamlin was shot with bullets that came from multiple guns.

34.    Police were then notified of another shooting victim, who was at St. Joseph's Hospital, which was about ten blocks from the crime scene.  Police were dispatched to that hospital and the shooting victim was Plaintiff Gary Walker.

35.    Detectives DiBlasi, Baker and McGee came to Mr. Walker's hospital room and saw that Mr. Walker had been shot in the leg.  Detective DiBlasi took Mr. Walker's clothes from him that day.  However, the police never produced any test results on the clothes, which could have been exculpatory evidence for Walker.

36.    The next day, Mr. Walker was discharged from the hospital.

**Mitchell Pearce's Statement and Trial Testimony**

37.    After police arrived at the shooting scene, they took the three men who were working that afternoon at the barbershop near where Hamlin was shot - Mitchell Pearce, Reginald Hale and William Benjamin - down to the Police Administration Building (PAB), Homicide Division for questioning.  All three were questioned for hours about what they saw earlier that day.

38.    Detective Mee interviewed Pearce and recorded what he purportedly said about what he witnessed on the day of the shooting.  The statement says that Pearce had finished with his last customer and was sitting talking to the others in the shop when he saw Man come into the shop and play a video game.  As Pearce got ready to leave to pick up his daughter from school, he saw a guy who he didn't know come to the door and open it.  This man sounded angry

with Man, and Man appeared upset.  Pearce and the other barbers told Man and the other person to chill and take the arguing outside.  Both the guy at the door and Man left the shop.

39.     Pearce left the shop soon thereafter, and he saw Man and the guy about two doors down in front of an abandoned house, still arguing.  Man was standing with his back to the abandoned building and the other guy was standing over him by the curb.  Then Pearce saw the guy reach back for his gun and he started shooting at Man.  Man went right down.  As Pearce supposedly stated, even if Man had a gun, he "never had a chance" to defend himself.  Pearce ran back into the shop and went to the back with the other barbers and customers, where he made sure to lock the back door.  He said he heard about 30 shots.  Pearce and others stayed in the shop and waited until a few minutes after the shots stopped before going outside.

40.     Pearce described the shooter as between 25 and 30 years old, 155-160 lbs., dark skinned and with a full trimmed beard.  Also reflected in the statement was that Detective Mee showed Pearce a photo array of eight photos, from which he supposedly picked Mr. Walker's photo as the guy who came to the store looking for Man.

41.     The statement said that Man's friends came by the scene and drove Hamlin to the hospital.  Then Pearce and Hale drove to the hospital to see how Hamlin was doing, but he had already been taken to Jefferson by that time.  One of the girls who had driven Hamlin to the hospital asked Pearce to drive her car back home, which he did.  So, Pearce came back to the shop, where he saw a lot of cops and other people outside.

42.     During trial, however, Pearce disputed virtually everything that was recorded on his statement.  Instead, he testified that he had *not* witnessed any of the shooting, much less seen Mr. Walker shoot Man at close range.  He had *not* seen the shooter or the person that came to the

shop door and only arrived at the murder scene after Hamlin had already been shot and there
were many people from the neighborhood surrounding him.

43.     Specifically, Pearce testified that on the afternoon in question, he was busy
cutting hair when Man came into the shop. He was not sitting around talking with others in the
shop or waiting to leave to pick up his daughter from school. He was only going to pick her up
when he had a break at work.

44.     Pearce did not remember seeing anyone in particular come to the door, as there
are a lot of customers that come and go into the shop, and he doesn't pay attention to everyone
coming in. Sometime after Man left the shop, Pearce heard a lot of shots coming from outside.
Pearce and others in the shop went to the back of the store while the shots were firing. He
denied that he "made sure to lock the back door" *because the store does not have a back door*.

45.     Then he and Hale went outside and saw Hamlin on the ground surrounded by
several people. Hamlin's friends drove him to the hospital. Pearce drove with Hale to his
mom's house to make arrangements to pick up his daughter, and then they went to Girard
hospital to check on Hamlin's condition. Hamlin wasn't there anymore, but the girl who drove
Hamlin to Girard asked Pearce to drive her car back to the shop area.

46.     Pearce and Benjamin started to walk back to his mom's house, when Police
Officer Musial pulled up to them in his police vehicle and told them they had to come down to
the police station for questioning because they were witnesses. When Pearce and Benjamin were
reluctant to go, Musial told them that police would come by the next day and lock them up for
refusing to be questioned. So, he and Benjamin went down with Musial to the Homicide Unit.

47.     Pearce testified that he, Hale and Benjamin were held for questioning by several
detectives at the Homicide Division for several hours, and it took so long because the men

weren't giving the detectives the information that they wanted. Pearce said that several detectives kept telling him "You know the guy" who came to the door at the barbershop, and pressured him to pick a certain picture out of a photo array as that guy. They told him that he had to sign his statement or else he wouldn't be allowed to go home.

48.     Pearce testified that the group of detectives "roughed up" all three of them. Pearce was grabbed up and pushed. He saw a female detective, who was Det. Marie DeBlasi, kick Benjamin, and saw two male detectives, who were, upon information and belief, Detectives Dougherty and Mee, and Det. DiBlasi roughing Benjamin up. And he saw that Benjamin's hair had been pulled and his shirt was ripped.

49.     Pearce testified that he couldn't remember the name of the detective who interviewed him, but he did not dispute that it could have been Detective Mee, who was listed as the interviewer on his statement. He said that this detective essentially provided the details about what Pearce supposedly saw that day, and that's what the detective wrote down. This included the whole narrative that he witnessed the shooting, the description of the shooter's height, weight, age, complexion and facial hair, and that he picked Walker's photo out of the photos shown him. In Pearce's words, the detective who interviewed him "was telling me more of the story than I could tell him, like he was there."

50.     Pearce admitted that he signed his statement. But he explained that the detective pressured him to sign, and based on the extensive questioning and pressure he received from several of the detectives, he did not feel like he would be free to go home unless he signed what they put in front of him.

51.     In summary, Pearce testified under oath at trial that Detective Mee, with the help of Detectives Dougherty and DiBlasi, coerced him into signing a statement that was full of a

fabricated story about what Pearce saw regarding the shooting death of Hamlin that falsely implicated Mr. Walker as shooting Hamlin multiple times at close range. The methods of coercion included physical assault, and threats, intimidation and harassment to keep them at the station and not let them go home if they didn't say the correct statement or pick the correct picture.

**Reginald Hale's Statement and Trial Testimony**

52.     Detective Dougherty interviewed Hale and recorded what he purportedly said about what he witnessed on the day of the shooting. According to the statement, about a half hour before the shooting, Hamlin came into the barber shop and went and played the Mortal Combat II video game. Hale was cutting a customer's hair at this time. While Hamlin was playing the video game, the front door opened. Hale could not see the person who opened the door because it was only open a crack, but he saw Hamlin walk toward the door.

53.     Hale could not hear what Hamlin was saying, but he could tell that Hamlin was really excited about something. He saw Hamlin waving his hands in the air, pointing his one hand at the door, and he looked like he was arguing with the man at the door. Hale thought that he saw Hamlin reach inside his pocket and point at a silver object, which Hale believed was an automatic silver handgun. Hale then heard Pearce say, "You all shouldn't be bringing that drama in here." Then Hale saw Hamlin go outside.

54.     Meanwhile, Hale continued to cut a customer's hair. A few minutes later, Hale heard about ten gunshots outside, which sounded like they came from up 7th Street. Then he and his customer ran to the back of the shop. He said it sounded like more than one gun was used, and that one of the guns was likely automatic because the shots were so constant.

55.     After the shots stopped, they went outside and Hale saw that Hamlin was lying on the pavement a few doors up from the shop.  There were a lot of people surrounding him and Lorenzo Andrews was telling Hamlin to wake up.  He also saw a new, white Nissan Pathfinder with a gold package on the corner facing up 7th Street, which had tinted windows and two people inside.  Right after the shooting the vehicle backed up onto Diamond Street and headed towards 6th Street.

56.     Then Heidi, a girl from the neighborhood, drove to the scene and they put Man in her car to drive him to Guiffre.  Hale drove Pearce in his car to pick up his daughter from school, and then they returned to the shop.  Then Hale drove with Pearce to Guiffre to see Hamlin, and Heidi asked Pearce to drive her car back because she had to go to talk to the police.  Then Hale heard that Hamlin had been taken to Jefferson Hospital, so Hale drove there, which is where he was told that Man was dead.

57.     Hale then drove back to the shop, where he was met by a homicide detective who asked him to come down to the Police Administration Building for questioning.

58.     The statement reflects that later on during the interview, Detective Dougherty told Hale that he had "just learned that the person who came to the door and had words with Man was actually at the doorway for almost a minute before he left."  Detective Dougherty told Hale to "think about that" and then asked him if he wanted to change anything Hale had told him.  Hale supposedly responded by saying that he was afraid for his and his wife's life because these are dangerous people.  Suddenly, Hale did an about face and said that he "did see the guy who came to the door and started arguing with Man."

59.     Det. Dougherty then showed Hale a photo, which Hale identified as Man's friend Andrews.  Then he was shown a photo array, from which Hale selected a photo that he described

as looking like the guy that opened the door and argued with Man. That photo was of Mr. Walker.

60.     For the most part, Hale's testimony at trial was consistent with his statement, with the exception of his identification of Mr. Walker from the photo array. Specifically, Hale testified that when Det. Dougherty put the photo array in front of him, and asked him if he recognized anyone, Hale looked at them for between five to ten minutes and then said "No." Then Det. Dougherty pointed him to a single photo, which was of Mr. Walker, and asked Hale if he recognized the person in that photo. When Hale answered "No," Det. Dougherty said "This is the guy, this is the guy right here, he's shot in the hospital. This is what Mitch [Pearce] said, this is what Will [Benjamin] said." In response, Hale said "Well, if that is what you say, this is him." Then Detective Dougherty said that "we'll circle this picture right here because this is the guy," to which Hale replied, "Well, it might have been him, I'm not sure." Hale testified that none of this explanation was in the statement.

61.     Otherwise, Hale testified consistently with his statement, including reiterating that he believed that Hamlin had a gun that day while he was in the shop because when Man started pointing his finger at the guy at the door, it appeared that he had a silver object on him that looked a 9-millimeter automatic weapon.

62.     In summary, Hale testified under oath at trial that Detective Dougherty coerced him into identifying Walker out of an array of photos by using intentionally suggestive techniques, such as pointing out which photo the detective wanted him to pick.

### William Benjamin's Statement and Trial Testimony

63.     William Benjamin's statement was taken by Detective Maria DiBlasi on December 13, 1995. According to the statement, Benjamin was cutting a customer's hair when

14

Hamlin came into the shop.  He observed him go to play the Mortal Combat Video game.  He said that Pearce and Hale were also with customers at this time.  Then the front door opened, but because he had his back to the door, he did not see who came in.  Then Hamlin walked outside the shop.  Benjamin could hear arguing outside, but couldn't understand the words.  Then he heard seven to eight rapid fire, back-to-back shots.

64.     After the shots stopped, he went to peek out the door, and saw Man laying down on the sidewalk three doors away.

65.     At trial, his testimony slightly differed from his statement in that when Man left the shop, the only thing he heard were voices talking, not arguing.

### Lorenzo Andrews' Statement and Trial Testimony

66.     Det. Jastrzembski took Andrews' statement on December 14, 1995, the day after the homicide, at his mother's house.  According to his statement, in the afternoon of December 13, 1995, Andrews was in the barber shop with Man and barbers Pearce, Hale and Benjamin.  Andrews said that the door opened, and everybody turned around and saw that "Gary" was standing there.  Andrews saw that he was holding a 9 mm gun in his hand.  Gary said to Man "Come here, I want to talk to you," and Pearce said: "Take it outside."  Man stepped out and talked to Gary.  Andrews then left the shop and started talking to two "boys" in a white Cherokee jeep with blue trim parked in front of the barber shop.  He had seen them around and knew that they were from Park Ave. and York Street, which is from around "Gary's area."

67.     While Andrews was talking to the Jeep driver, Hamlin and Gary walked up the street two to three houses.  Suddenly, Andrews heard 7 to 8 gunshots coming from where Man and Gary were.  Andrews turned toward Man and Gary, where he saw Gary and Man, with Gary holding Man up against the wall and shooting him.  He then saw Man falling down.

68.     Next, the statement says Andrews saw Gary run up toward Susquehanna Ave., and then Andrews started running over to Hamlin.  Andrews then saw the two boys in the Jeep shooting up the street toward him (Andrews), and then drive down Diamond.  Then a girl from the neighborhood took Hamlin and him to the hospital.

69.     In his statement, Andrews claimed that neither he nor Hamlin had a gun at any time that day.  He also denied knowing anything about why the shooting occurred.

70.     On December 15, 1995, the day after Detective Jastrzembski took Andrews' statement, and just two days after the police arrived at the scene of a multi-gun shootout where the murder victim wasn't even there, Detective Jastrzembski swore out an affidavit of probable cause for the arrest of Mr. Walker for the murder of Hamlin.  Andrews' statement was the sole piece of evidence relied on by the police in the affidavit of probable cause.

71.      Andrews testified on the first day of Mr. Walker's trial, which took place on July 2, 1997.  Andrews was the Commonwealth's only witness who testified that he saw Mr. Walker shoot Hamlin.  In his trial testimony, Andrews added to his December 1995 statement that the name of the driver of the Jeep Cherokee was "Bernie;" that he saw Gary hold the gun within one foot of Hamlin and shoot Hamlin just above his right hip; that he could tell it was a 9 mm gun by the sound of the shots; and that he and Hamlin were very close friends.

72.     Andrews' testimony diverged from his December 1995 statement when he testified that while he was talking to Bernie, the driver of the Cherokee, he heard about five shots.  When he turned around, he saw Man falling down the wall, and saw Gary with the gun in his hand.  In his statement, he said that after hearing 7 to 8 shots, he turned toward Hamlin and Gary, where he saw Gary holding Man up against the wall shooting him, and then seeing Man

falling to the ground.  After that, Andrews ran away around the corner towards his house, and then heard 7 to 8 more shots.

73.    Andrews said he called the police the next day to tell them what happened, and that the police came looking for him at his mom's house, where they interviewed him.

### Police Officer Musial's Statement

74.    Police Officer Musial went to the crime scene in response to a police radio broadcast.  Even though the victim was no longer there, Officer Musial learned that the victim was Hamlin.  He stated that he knew Hamlin from patrolling the neighborhood and had contact with him on several occasions.  In fact, less than an hour and a half before the radio broadcast, he received information that Hamlin had a gun.  He then observed Hamlin at Darien and Diamond Street.  Once Hamlin saw Officer Musial, he ran away through the playground at 8th and Diamond.  He also stated that within the hour of that encounter, he observed a white Nissan on the corner of 7th and Diamond.

75.    This directly contradicts Andrews' testimony that Hamlin did not have a gun that day.  It also corroborates Hale's testimony that he saw Hamlin with a gun when he was in the barbershop.


### Detective Jastrzembski's Testimony and Misconduct

76.    Jastrzembski testified at trial that ever since Andrews described his interactions with the driver of the white Cherokee, he (Det. Jastrzembski) was interested in finding the driver because he was a witness to the crime and also could have been involved in it.  He also testified that police searched for the vehicle but never found it.  Det. Jastrzembski said that he remained interested in finding both the driver of the vehicle and the vehicle itself.

77.     Det. Jastrzembski testified that when he interviewed Andrews the day after the shooting, Andrews was so upset over the shooting of his friend that he couldn't even remember Gary's last name.

78.     Nonetheless, even though Andrews was the sole witness relied on by the police and the Commonwealth in the affidavit of probable cause and at trial to arrest and prosecute Mr. Walker as the sole shooter in the multi-gun shootout that day, Det. Jastrzembski testified that he did not feel a need to re-interview Andrews at a later date in order to try to identify the driver of the vehicle or to get any additional information from him.

79.     At trial, Andrews testified that he knew that the driver's name was "Bernie." When Jastrzembski was asked at trial if it would have been helpful if Andrews had told him the driver's name was "Bernie," he said that it would not have likely helped him to identify the driver.

80.     However, this testimony at trial was completely false.  As was revealed in the documents produced to Mr. Walker in his underlying PCRA proceedings in 2021, Det. Jastrzembski and other detectives withheld and concealed several pieces of evidence from the D.A. and from Mr. Walker that showed that more than a year before trial, the detectives had identified the full name of the driver as "Bernard Sanford," had investigated and obtained his criminal history, and had interviewed an inmate whom Bernie had visited in jail just one month after the murder, wherein Bernie relayed his account of the shootings and what led up to them.

81.     Specifically, police withheld Bernie Sanford's printed out criminal record, which revealed his convictions for multiple firearms offenses and a possession of a controlled substance offense in 1992, 1993 and 1994.

82.     Police also withheld a page of notes of summaries of interviews conducted in the investigation, which describes Steven Mickens' statement taken by Detectives Rocks and Graebs as saying that "Bernie Sanford relates the whole job to him."  Police also withheld Steven Mickens' statement from Mr. Walker.  In his statement, which was taken on April 2, 1996 -- less than four months after the crime -- Mickens told homicide detectives that less than a month after the crime, Bernie Sanford had visited him in prison and told him what led to the shootout in December 1995 and what happened as a result.  Specifically, Mickens, who was in prison at the time of the shooting, stated that he first learned that Hamlin had been killed when he called home and talked to his sister, who told him that Hamlin had been shot to death and that Bernie was involved in the shooting.  When Bernie visited him in prison in January 1996, he told him that Man had sold him some bad drugs.  Bernie told him that he was driving around with Gary and a man named "Marvin" who went by "Fish" in his white jeep and they saw Hamlin outside the barber shop at Diamond and 4th Streets.  Gary and Hamlin started to argue, and Hamlin came over to Bernie and told him he would never sell bad drugs.  Then Gary pulled out his gun, but put it back when Man started to pull out his gun.  Then Gary started shooting, Man shot Gary in the leg, and Man was lying on the ground.   Then Bernie took Gary to the hospital.  Mickens provided the detectives with Bernie's full name and address.

83.     Thus, only three and a half months after the crime, and more than one year before Mr. Walker's trial, Det. Jastrzembski and the detectives working with him and/or under his supervision, including Detectives Rocks and Graebs, had identified the full name of the driver as Bernard Sanford, his full address, and his account of the events that led to the Man's shooting death.  Therefore, Det. Jastrzembski lied under oath at trial about the fact that they did not know

who the driver was and would not have been able to identify him with only knowing his nickname of "Bernie."

84.    Because the police withheld this evidence from Mr. Walker about the identity of the driver, his criminal background, and what he might testify to, and lied about the concealment of this evidence under oath at trial, Mr. Walker was deprived of the opportunity to directly contradict and impeach the veracity of Andrews statement' and testimony at the Preliminary Hearing and trial testimony of Andrews, as well as the veracity and validity of Det. Jastrzembski's affidavit of probable cause and testimony at trial.

85.    Specifically, Andrews' testimony was the Commonwealth's only basis for its theory that Mr. Walker shot Hamlin from one foot away, that no one other than Mr. Walker was armed that day, and that no one else fired a gun in that shootout.  Andrews' testimony that Walker shot Hamlin at close range was contradicted by the Medical Examiner, who testified that there was no evidence that Man was killed at close-range.  It was also contradicted by the ballistics evidence that there were three to five different firearms that were used at the scene. Had Mr. Walker been given the information about Bernie's identity, address and what he told Mickens, which was deliberately withheld by the police, that would have enabled him to further contradict the veracity of Andrews's testimony that Walker shot Hamlin at close range.

86.    Similarly, Andrews' testimony that only Walker's gun was used that day, and that neither he nor Man were armed that day or shot a gun that day was contradicted by the ballistics evidence, which showed that three to five guns were used that day.  If Mr. Walker had been given the information about Bernie that the police deliberately withheld, that would have enabled him to undermine the veracity of Andrews' testimony that neither he nor Man were armed that day.

87.     Additionally, the concealment of this evidence about Bernie's identity, address and version of the events that day deprived Mr. Walker from being able to develop a viable alternative suspect theory at trial.  Central to Andrews' version of the events that day was that all of the shooting between Walker and Man took place while he (Andrews) was standing next to Bernie's Jeep speaking with him.  As Det. Jastrzembski conceded at trial, Bernie was an important witness to the crime and a potential shooter.  Had Mr. Walker been given this information that was deliberately withheld by the police, he would have been able to put forth a theory that Bernie was also looking for Man for selling him bad drugs and that he decided to shoot at Man, which caused Walker to get hit in the crossfire.

88.     In summary, Det. Jastrzembski violated Plaintiff's constitutional rights by: fabricating false, inculpatory evidence in the form of creating testimony for Andrews to testify to a made-up story about what he saw on December 13, 1995; and in concert with Detectives Rocks and Graebs, by intentionally withholding and concealing from the Plaintiff and the prosecution exculpatory evidence about the identity and address of the driver of the white Jeep, and then lying about the existence of this evidence under oath.

89.     Det. Jastrzembski engaged in similar misconduct prior to and during the investigation and prosecution of this case in other cases including,

   a.   Fabricating a confession and DNA evidence (*Anthony Wright* case in 1996);

   b.   Concealing a lead to an alternate suspect (*James Dennis* case in 1991-92); and

   c.   Coercing witnesses to make false statements and falsely identify suspects from photo arrays (*Percy St. George* case in 1993-94).

90.     All of the individual Defendants were involved in the Hamlin murder investigation.  To the extent that the names of any of the individual Defendants were not listed

on a specific Investigation Interview Record or the witnesses were unable to remember the

names of every detective they encountered, it is averred that all individual Defendants learned of

the misconduct alleged above by virtue of their working on the same investigation and their

sharing of information with one another.  As such, all defendants knew of or recklessly

disregarded each other defendant's unlawful actions and inactions throughout the Hamlin

investigation and the arrest, prosecution and conviction of Mr. Walker, and failed to act to

prevent those actions and/or inactions from causing harm to him.

91.     Thus, all Individual Defendants knew that exculpatory evidence pertaining to the

identity and address of the driver of the white Jeep and Steven Mickens' statement were being

suppressed as part of the deliberate deception of Mr. Walker, thus denying him a fair trial.

92.     Thus, all individual Defendants knew and/or were deliberately indifferent to the

rights of Mr. Walker in their use of and tolerance for overly suggestive identification

interrogations which resulted in witnesses improperly identifying Mr. Walker.

93.     For many years, dating back at least to the 1970's, and continuing well beyond the

investigation into the death of William Hamlin, the City of Philadelphia had in force and effect a

policy, practice, or custom of unconstitutional misconduct in homicide investigations, and in

particular, using coercive techniques in interviews and interrogations to obtain incriminating

evidence; fabricating inculpatory evidence; conducting improper identification procedures;

concealing or withholding exculpatory evidence; tampering with or manufacturing evidence; and

fabricating incriminating statements from witnesses, suspects, and arrestees.

94.     These practices were well known to the City of Philadelphia and its policymakers

as a result of newspaper investigations including Pulitzer Prize winning reporting in the

Philadelphia Inquirer in 1977, governmental investigations, complaints from lawyers and civilians, and internal police investigations.

95.    Various cases demonstrate that this misconduct was pervasive within the PPD prior to and around the time of the Hamlin murder investigation and Mr. Walker's trial in 1997, and thereafter. The cases include the following:

a.    **Matthew Connor**: In 1980, Connor was convicted of the 1978 rape and murder of an 11-year-old girl whose body was found in the stairwell of an apartment building in Philadelphia. The medical examiner determined that the victim's wounds resulted from an ice pick. In 1989, while Connor was serving a life sentence, a non-profit organization persuaded the Philadelphia District Attorney's Office to revisit the case. The prosecution then discovered that police failed to turn over exculpatory evidence, including a recording of a call with a prosecution witness that contradicted her trial testimony, and evidence that police considered the victim's half-brother, who had a history of assaulting young girls and was observed carrying an ice pick around the apartment complex, as an alternative suspect. In February 1990, Connor was granted a new trial, and the next month the charges were dismissed.

b.    **Gerald Howell**: In late 1982 into the early months of 1983, Philadelphia Police Detectives coerced witnesses into inculpating Howell in a murder that was committed by Kenneth Parnell. PPD Detectives told Arlene Williams, a teenager at the time, that they would arrest Parnell, the father of her child, for the murder if she did not sign a statement inculpating Howell. PPD Detectives also threatened two other teenage witnesses with arrest if they did not come to court to testify against Howell, even though the police had reason to believe that Parnell was the real shooter. Additionally, PPD Detectives suppressed information given to them by the brother of the decedent that Parnell was the shooter. Years later, Parnell confessed to the murder for which Howell had been convicted. In 2022, the DAO conceded that the PPD had suppressed exculpatory evidence. In 2023, a federal judge granted Howell's habeas corpus petition and vacated his conviction. Howell was released in 2023 after being imprisoned for four decades for a crime he did not commit.

c.    **Bruce Murray and Gregory Holden**: In 1983, Murray and Holden were convicted of a 1980 murder based on PPD Homicide Division detectives knowingly presenting fabricated trial testimony, coercing false witness statements, and suppressing exculpatory evidence. Murray and Holden were exonerated in April 2023 and January 2024 respectively based on the DAO's acknowledgement that numerous pieces of favorable evidence were suppressed during the original trial.

d.   **Alen Lee:** In September 1983, Alen Lee was arrested in connection with the murder of 25-year-old restaurant manager Jade Wong. The murder was committed by three Asian men who announced that they were gang members from New York City and who tried to extort Wong for money. Philadelphia detectives secured a conviction of Lee by fabricating an informant statement to implicate Lee, despite having credible information pointing to alternative suspects. Ultimately, Lee's conviction was vacated in April 2004 after Lee presented evidence that at the time of his trial, Philadelphia police failed to disclose evidence of the true perpetrators.

e.   **Willie Stokes**: In 1984, PPD detectives arrested a man named Franklin Lee on rape and related charges. After his arrest, homicide detectives interviewed him about a 1980 murder and falsely told him that another witness had identified Willie Stokes as the person who committed that murder. Detectives insisted that Lee knew that Stokes was the murderer and that he needed to cooperate with their investigation, or, otherwise they would "hang" him. Lee succumbed to the pressure and agreed to sign a false statement implicating Stokes in the murder. For years, Lee continued to have contact with the investigating detectives, who, in order to maintain control over their informant, arranged for him to have access to drugs and sexual encounters while incarcerated. Stokes remained wrongfully imprisoned for 39 years until December 2021 when a federal district court vacated his conviction based on the investigating detectives' pervasive misconduct.

f.   ***Commonwealth v. Raymond Carter*** – This matter, which was investigated from 1986 until his conviction in 1988, resulted in the exoneration of Mr. Carter after former police officer Thomas Ryan was indicted in February 1995 on federal corruption charges.  A Philadelphia judge ordered a new trial because the prosecution's star witness had been paid $500 by then-officer Ryan to testify against Carter.  The City of Philadelphia paid a "churchgoing grandmother" a significant settlement after she sued alleging Ryan helped frame her and send her to prison for 3 years.  In 1996, the Philadelphia Inquirer reported that Officer Jack Baird, who was Ryan's partner, fabricated evidence because Ryan wanted the overtime compensation often available to officers in murder investigations.

g.   **Curtis Crosland**: In 1987, PPD officers interviewed an informant with a long history of violent crimes who was seeking assistance from law enforcement to reduce his sentence for a parole violation. The informant told officers that Curtis Crosland had at some undetermined time in 1986, confessed that he committed a 1984 robbery and murder at a neighborhood grocery store in South Philadelphia. Investigating detectives knew that the informant's statement was false; the informant had provided inconsistent information to police, had failed a polygraph, and had told other family members that another person—that is, not Curtis Crosland—had admitted to the crime. Despite this knowledge, detectives persisted in bringing charges against Crosland and then suppressed all information in their possession showing the falsity of the informant's testimony. Further, detectives suppressed and concealed information pointing to an alternative

suspect—information that was highly credible as the suspect matched the size and description of the perpetrator given by eyewitnesses to the shooting. Crosland was convicted as a result of these unlawful police tactics and remained incarcerated for 34 years until an investigation by the CIU located he referenced exculpatory information in police files. In 2021, a federal district court accepted the CIU's concession that Crosland was entitled to relief and was likely innocent, and, therefore, vacated the conviction.

h.   **Andrew Swainson**: PPD Homicide Division detectives based their 1988 arrest of Swainson on the testimony of a single witness who had been taken into custody while running from the scene of the murder in blood-soaked clothes. The witness provided a facially unbelievable narrative of the shooting after PPD detectives coerced him into identifying Swainson as the perpetrator. After this witness recanted his statements several times, PPD detectives pressured a different vulnerable young witness to support his false claims at trial. Based on this misconduct and the suppression of exculpatory evidence, in June 2020, Swainson's conviction was vacated and all charges were dismissed.

i.   **Pedro Alicea:** In 1989, after failing for four years to resolve a 1985 double homicide of brothers Hector and Luis Camacho, PPD detectives fabricated a case against Pedro Alicea out of whole cloth. To build a false case against Alicea, detectives disregarded significant evidence demonstrating that two local drug dealers were responsible, and leaned on vulnerable individuals to obtain false identifications of Alicea as the shooter. The officers pressured Angel Fuentes, a longtime informant who had a close personal relationship with the lead detective, and who was facing significant prison time on a number of open charges, to endorse a fabricated statement identifying Alicea as the shooter. They then coerced Ray Velez, who had himself been implicated in the murders, to likewise falsely identify Alicea as the shooter, by detaining him and threatening to charge him with the murders if he did not submit. Detectives suppressed substantial exculpatory evidence, including a reliable eyewitness statement, pointing to the true perpetrators. Alicea was convicted as a result of the detectives' misconduct and wrongfully imprisoned for more than 31 years before the exonerating evidence was discovered by the CIU, resulting in the vacatur of his conviction and release in 2020.

j.   **Donald Ray Adams**: PPD Homicide Division detectives coerced a witness to implicate Adams in a 1990 murder by threatening the witness and also offering to provide her financial support for her testimony. In securing the statement, detectives ignored the fact that Adams's physical description was vastly different from the description provided by witnesses at the scene. Adams's conviction was later vacated, and he was acquitted at a retrial. His subsequent civil suit resulted in a financial settlement.

k.   **Ronald Johnson**: Following a 1990 homicide, PPD Homicide Division took nine different statements from two witnesses who had initially exculpated Johnson and

coerced them until they agreed to inculpate him. Johnson spent 34 years in prison before the DAO located suppressed evidence of the coercion in police files. Based on this buried evidence of police misconduct, Johnson's conviction was vacated in March 2024.

l.    **James Dennis**: PPD Homicide Division detectives investigating a murder in 1991 coerced witnesses to identify Dennis while at the same time they intentionally concealed information which provided Dennis with incontrovertible alibi. The detectives' conduct led to the Third Circuit's issuance of an en banc decision concluding that the concealment of evidence violated Dennis's due process rights. See Dennis v. Sec'y, Pa. Dep't of Corr., 834 F.3d 263, 307 (3d Cir. 2016). In 2024 an Eastern District of Pennsylvania jury found two investigating detectives liable for Dennis's wrongful conviction and awarded Dennis $16 million.

m.    **Anthony Wright**: Wright was convicted of the 1991 rape and murder of an elderly woman based on Homicide Division detectives' fabrication of a confession and planting of evidence. DNA testing later confirmed Wright's innocence, and he was acquitted at a retrial. His subsequent civil rights action litigated in this Court resulted in a settlement of nearly $10 million.

n.    **Troy Coulston**: In 1991, Coulston was convicted of a 1989 murder based on PPD Homicide Division Detectives knowingly presenting fabricated trial testimony, coercing false witness statements from a particularly vulnerable, teenage witness, and suppressing exculpatory evidence undermining the credibility of a key witness, that actual perpetrator of the murder. Mr. Coulston's conviction was vacated in 2021 based on the discovery of previously suppressed exculpatory evidence.

o.    **Walter Ogrod**: In 1992, PPD detectives coerced and fabricated a false confession from Ogrod, a trucker with a low-average IQ, to the 1988 murder of a four-year-old girl. Ogrod had driven all night and had not been to bed in 36 hours when the lead detective interrogated him. Detectives interrogated Ogrod for hours, then wrote out a fabricated statement in Q-and-A form they falsely claimed was a verbatim record of a voluntary statement from Ogrod, and coerced Ogrod into signing it. At his first trial, 11 of 12 jurors voted to acquit before a mistrial was declared. At a retrial three years later, with the aid of a notorious jailhouse snitch, the state convicted Ogrod of capital murder. Ogrod has since been exonerated, the charges nolle prossed, and he was released from prison after serving more than 25 years for a crime he did not commit.

p.    **Chester Hollman**: PPD detectives framed Chester Hollman for a 1991 murder he did not commit. Detectives coerced a witness, Deirdre Jones, who had no knowledge of the crime, to provide a false statement implicating the innocent Hollman; they typed out a statement implicating Hollman, falsely attributed it to Jones, and coerced her into signing it. Detectives also fabricated and coerced a statement from another witness, and buried evidence demonstrating Hollman's

innocence. In 2019, Hollman was exonerated based on DNA testing excluding him and pointing to another perpetrator. He had spent 28 years wrongly imprisoned.

q. **Willie Veasy**: Veasy was convicted of a murder based on a 1992 confession secured by PPD Homicide Division Detectives' use of physical force. The confession was plainly untrue in light of a fully corroborated alibi that Veasy was working in a popular and busy restaurant at the time of the murder. Veasy's conviction was vacated in 2019 upon the motion of the Philadelphia District Attorney's Office, and his subsequent civil rights suit resulted in a multi-million-dollar settlement.

r. **Percy St. George**: A PPD Homicide detective coerced two people in 1993 to give false statements implicating St. George in a murder. When the detective was asked to testify about the allegations of coercion and fabrication, he asserted his Fifth Amendment privilege against self-incrimination and declined to answer questions. Despite that assertion, the detective was permitted to remain active in PPD Homicide Division investigations for several years.

s. **Johnny Berry**: PPD homicide detectives arrested 16-year-old Johnny Berry for a 1994 robbery murder based on the testimony of an eyewitness who was in the company of the murder victim and the testimony of an alleged accomplice, Tauheed Lloyd. At trial, the eyewitness claimed that detectives had pressured her into identifying Berry and Berry was convicted based solely on Lloyd's testimony. Several years later, Lloyd acknowledged that he had lied about Berry. In 2019, the DAO agreed to vacate Berry's conviction, after which Berry learned that detectives had suppressed information regarding multiple witnesses who had heard Lloyd admit that he, not Berry, was the shooter. Berry's civil suit settled for $5.65 million.

t. **Terrence Lewis:** PPD detectives fabricated evidence and committed other serious investigative misconduct to convict Lewis of a 1996 murder he did not commit. This included coercing and fabricating witness statements and identifications, and deliberately hiding key exculpatory evidence that would have demonstrated Lewis's innocence. In 2019, Lewis was exonerated after he spent 21 years wrongly imprisoned.

u. **John Miller**: In June 1997, Miller was arrested for the 1996 murder of Anthony Mullen based on a statement PPD detectives obtained from alleged witness David Williams. Williams recanted during a 1997 preliminary hearing and at trial in 1998. Investigating detectives knew Williams's statement was untrue as he had given them provably false information on other subjects, but they failed to disclose their knowledge of this information undermining Williams's credibility. They continued to withhold that information for years, even after Williams confessed that he was the person who had committed the murder. In 2019, a federal district court vacated Miller's conviction based on its finding that

investigating detectives had suppressed critical information undermining the inculpatory evidence presented at trial, and the DAO subsequently dismissed all charges, stating that Miller had "met his burden of proving his innocence.

v.   **Eugene Gilyard and Lance Felder**: In 1998, Gilyard and Felder were arrested and subsequently convicted of the 1995 murder of Thomas Keal. During a cold-case investigation more than two years after the crime, PPD detectives fabricated and coerced witness identifications and statements and buried exculpatory evidence in order to secure charges against Gilyard and Felder. For example, after witness Keith Williams initially told detectives Felder was not a person he had seen at the time of the crime, detectives coerced Williams to identify Felder's photograph by visiting Williams's home multiple times, cursing and shouting at him, pushing on his head while pointing to Felder's photo. Similarly, after witness Patrick Harris told detectives he did not recognize anyone in the photo arrays he had been shown, detectives fabricated a report stating that Harris had identified Gilyard, when he had not. The true perpetrator confessed in 2011, confirming Gilyard and Felder's innocence, and in 2013 their convictions were vacated. In 2018, Gilyard and Felder reached a settlement with the City for compensation for their wrongful convictions.

w.   **William Johnson**: In September 2005, PPD Homicide Division detectives arrested Johnson for the shooting of an off-duty Philadelphia police officer after he had solicited a sex worker. Detectives pressured two sex workers who had been in the area to identify Johnson and another man as the shooter. In 2023, after the CIU produced materials proving that at least one of the witnesses had been coerced to testify against Johnson, habeas relief was granted, and Johnson was released after 18 years' imprisonment.

x.   **Recco Ford**: In 2007, detectives acting on an unsubstantiated anonymous tip detained two juvenile witnesses without their parents' knowledge and pressured them to identify 16-year-old Recco Ford as the perpetrator of a murder that occurred at a playground in southwest Philadelphia. Ford spent three years in pre-trial detention before his trial where, based on the testimony of two teenaged girls who had seen the shooting and called 911 to report it and who confirmed that Ford was not the perpetrator, he was acquitted. Ford later sued the detectives who caused his prosecution, and the City of Philadelphia settled his lawsuit for several hundred thousand dollars.

y.   **Steven Lazar**: Lazar was convicted of a 2007 murder as a result of PPD Homicide Division Detectiveso, fabricating witness statements from vulnerable individuals and securing a false confession by knowingly subjecting Lazar to more than 30 hours of interrogation while he was undergoing severe opioid withdrawal. Lazar's conviction was vacated in March 2023 based on the discovery of suppressed evidence after he had spent approximately 16 years in prison.

96.     The City's indifference to the misconduct that gave rise to the above-listed wrongful convictions and misconduct has continued unabated through today. Public news reporting documented that of over 41 cases resulting in exonerations between 2018 and 2025, PPD detectives have conducted only limited investigation into a small number of those cases. Instead of seeking to find the actual perpetrators of the violent crimes giving rise to these prosecutions and instead of remedying unlawful police misconduct, the City has chosen inaction.

97.     As evidenced by the pervasive nature of the conduct and the continuing indifference of the City in these cases, detectives in the PPD Homicide Division had free reign to engage in unconstitutional actions with the knowledge and acquiescence of City policymakers and PPD Homicide Division supervisors and command staff, all of whom were deliberately indifferent to this misconduct.

98.     At the time of the investigation of the Hamlin murder and prosecution of Mr. Walker between 1995 and 1997, the PPD had a policy, practice, or custom of concealing and withholding exculpatory evidence, creating fabricated evidence, and initiating prosecutions without probable cause.

99.     These practices, as exemplified by the investigations in Mr. Walker's case and in those detailed above, continued for years due to the deliberate indifference of the City of Philadelphia. Those practices date back for decades. These practices were well known to Defendant City, and its policymakers, with respect to criminal investigations and prosecutions as a result of newspaper investigations, including Pulitzer Prize winning reporting in the Philadelphia Inquirer in 1977-1978, governmental investigations, complaints from lawyers and civilians, and internal police investigations, including the PPD's 39th District Corruption

Scandal in the 1990's, complaints lodged by the public, prior litigation and internal police investigations.

100.    The 39th District Corruption Scandal involved widespread unconstitutional practices that were not appropriately addressed or remediated despite pervasive knowledge throughout the PPD and Defendant City. The police misconduct in the 39th District Corruption Scandal included constitutional violations that mirror those violations suffered by Gary Walker including omission of material information and suppression of exculpatory evidence, physical abuse and coercive interrogation tactics, and false allegations of criminal conduct. The PPD was deliberately indifferent to the officer's misconduct and credible complaints to their internal compliance department were disregarded.

101.    As a result of a pattern of police misconduct that was in effect at the time of the investigation of the murder of William Hamlin for which Gary Walker was charged, the United States District Court for the Eastern District of Pennsylvania entered a consent decree in the matter of *NAACP v. City of Philadelphia* requiring widespread reforms in the PPD, while also limiting certain aspects of their investigative practices and policies.

102.    This practice, as exemplified by the investigation into Mr. Walker's wrongful conviction, and those detailed hereinabove, continued for years due to the deliberate indifference of the PPD and Defendant City to these policies, practices and customs.

103.    During the 1980's and early 1990's, and concurrent with the time of the investigation and prosecution of Gary Walker by the PPD, there was, within the PPD a pattern, practice and custom of violating the constitutional rights of criminal suspects and others, including systemic violations of the Fourth and Fourteenth Amendments. On three (3) separate

occasions in the 1980's, courts in the Eastern District of Pennsylvania issued orders enjoining the

PPD from engaging in these practices:

      a.  **Cliett v. City of Philadelphia**: Consent decree arising out of "Operation Cold Turkey", that resulted in the unlawful arrest and detention of 1500 individuals in drug enforcement practices);

      b.  **Spring Garden Neighbors v. City of Philadelphia**: Enjoining police sweeps of Latinos in Spring Garden area in a homicide investigation);

      c.  **Arrington v. City of Philadelphia**: Enjoining stops, detentions and searches of African-American men during investigation of the "Center City Stalker").

104.    In a more recent investigation into wrongful convictions in Philadelphia, Inquirer

reporter Samantha Melamed spoke with former homicide detective Michael Chitwood.

Chitwood, who went on to a long career as Upper Darby Police Chief, admitted to the Inquirer

that training of homicide detectives was known to be inadequate:

Back then, police didn't have the ample data available today: cellphone records, DNA analysis. And, like now, they were facing upward of 400 murders a year, hampered by witnesses too fearful to come forward. **Chitwood said detectives were not formally trained to meet that challenge. They handled cases as they saw fit.**

105.    "There was no set standard. It was just: Solve the case," Chitwood said.

Philadelphia Inquirer, Losing Conviction, May 7, 2021;

https://www.inquirer.com/crime/a/philadelphia-murder-exonerations-wrongful-convictions-

20210507.html

106.    In summary, at the time of the investigation and prosecution of Gary Walker, the

PPD and its policymakers were deliberately indifferent to PPD's practice, policy and custom of:

      a.  Concealing and/or failing to disclose exculpatory evidence, engaging in unlawful interrogation of suspects, using coercion and threats during interrogations, unlawful witness detentions and interrogations, fabricating and planting evidence, fabricating witness and suspect statements, and using improper identification procedures, and using these practices to target people of color for unlawful treatment;

b. Allowing detectives to engage in illegal and coercive tactics to secure evidence in homicide cases.

c. Failing to take appropriate disciplinary or other corrective actions with respect to police officers who engaged in illegal or unconstitutional conduct;

d. Failing to properly train and supervise officers with respect to the constitutional limitations on their investigative, detention, search and arrest powers;

e. Ignoring, with deliberate indifference, systemic patterns of police misconduct and abuse of civilians' rights in the course of police investigations and prosecutions of criminal suspects and Defendants, including unlawful police interrogations, searches, arrests, coercion of witnesses, falsifying and fabrication of evidence and suppression of exculpatory evidence;

f. Failing to properly sanction or discipline PPD officers, who are aware of and conceal and/or aid and abet violations of constitutional rights of individuals by other PPD officers, thereby causing and encouraging PPD police, including the Defendants in this case, to violate the rights of citizens, such as Gary Walker.

107. At the time of the investigation and prosecution of Gary Walker, and for many years before and thereafter, the PPD and Defendant City has been deliberately indifferent to the need to train, supervise and discipline police officers. The Internal Affairs Division ("IAD") of the PPD has failed to provide an internal disciplinary mechanism that imposes meaningful disciplinary and remedial actions in the following respects:

a. excessive and chronic delays in resolving disciplinary complaints;

b. a lack of consistent, rational and meaningful disciplinary and remedial actions;

c. a failure to effectively discipline substantial numbers of officers who were found to have engaged in misconduct;

d. the PPD's internal investigatory process fell below accepted practices and was arbitrary and inconsistent;

e. the PPD discipline, as practiced, was incident-based rather than progressive, thus, repeat violators were not penalized in proportion to the number of violations;

f. the conduct of IAD investigations demonstrated that PPD internal affairs personnel were not adequately trained and supervised in the proper conduct of such investigations;

g.  a global analysis of IAD's investigatory procedures indicated a pattern of administrative conduct where the benefit of the doubt was given to the officer rather than the complainant;

h.  serious deficiencies in the quality of IAD investigations and the validity of the IAD findings and conclusions;

i.  lack of an effective early warning system to identify, track and monitor "problem" officers;

j.  IAD frequently failed to interview available eyewitnesses to incidents involving citizen complaints of misconduct, interviews that were conducted were below acceptable standards of police practice and failed to address key issues; and

k.  IAD failed to acknowledge the disproportionate use of force used by police officers in the investigation of citizen complaints and failed to properly categorize the police officers' misconduct in those cases as an impermissible use of force.

108.  The PPD's conduct in this case was not an isolated incident and was instead the result of customs, policies and practices of the PPD prior to and at the time of the unlawful investigation into the murder at issue. The PPD, by and through its final policy makers, maintained an official policy, pattern, practice, or custom of suppressing coercing confessions and fabricating evidence in violation of Gary Walker's and others' constitutional rights.

109.  Further, the PPD failed to train, educate, and supervise officers including Detective Defendants regarding proper conduct in police work and investigations. Thus, the Defendant Detectives and the PPD officers were inadequately educated and trained about their constitutional and ethical responsibilities to criminal defendants. The lack of oversight of Defendant Detectives and other homicide detectives in the PPD by the PPD compounded the constitutional violations by eliminating any mechanism by which such violations would be identified and rectified.

110.  Yet, the PPD and Defendant City, by and through its final policymakers, implemented the policy, practice and customs of coercing jailhouse informants or other criminal

defendants into adopting fabricated statements for use in prosecuting and convicting persons of interest in deliberate indifference to the substantial likelihood that these customs, practices, and policies would result in constitutional violations like those that occurred in Gary Walker's case.

111.    Such policies, customs and practices of the PPD were the moving force behind the fabricated and coerced statement of Pearce via physical and verbal assaults, threats and harassment employed by Detectives Mee, Dougherty, and DiBlasi; the overly suggestive pressure used by Det. Dougherty to force Hale's false identification of Mr. Walker; Det. Jastrzembski's fabrication of false, inculpatory evidence by creating inculpatory testimony for Andrews to testify to; and Detectives Jastrzembski, Rocks and Graebs' intentional withholding and concealing from the Plaintiff and the prosecution exculpatory evidence about the identity and address of the driver of the white Jeep, and then lying about the existence of this evidence under oath, and the use of that tainted evidence in the conviction and imprisonment of Gary Walker.

**DAMAGES**

112.    The unlawful, intentional, willful, deliberately indifferent, and reckless acts and omissions of the individual Defendants and the City of Philadelphia caused Mr. Walker to be improperly arrested and subjected to the horrors of imprisonment, unfairly tried, wrongfully convicted and forced to serve more than 28 years in prison for a crime he did not commit.

113.    As a direct result of Defendants' conduct and omissions, Mr. Walker sustained injuries and damages, including loss of freedom for more than 28 years, loss of his youth, loss of his relationships with family members, pain and suffering, mental anguish, emotional distress, countless indignities, degradation, permanent loss of natural psychological development, loss of

life's pleasures, and restrictions on all forms of personal freedom, including but not limited to diet, sleep, personal contact, educational opportunity, vocational opportunity, athletic opportunity, personal fulfillment, sexual activity, family relations, reading, television, movies, voting, travel, enjoyment, and freedom of speech and expression.

114.    As a direct result of Defendants' conduct and omissions, Mr. Walker sustained economic injuries and damages, including loss of income from the employment he maintained before his wrongful arrest and incarceration and the loss of career opportunities.

115.    As a direct result of Defendants' conduct and omissions, Mr. Walker sustained physical injuries, including physical pain and suffering, personal injuries, physical illness, and inadequate medical care.

## COUNT I
### 42 U.S.C. § 1983 Deprivation of Liberty without Due Process of Law Under the Fourteenth Amendment and Denial of a Fair Trial by Fabricating Evidence, Withholding Material Exculpatory and Impeachment Evidence, and Deliberately Failing to Conduct a Constitutionally Adequate Investigation
### (Against All Individual Defendants)

116.    The preceding paragraphs are incorporated by reference as though fully set forth herein.

117.    The individual Defendants, acting individually and in concert, and within the course and scope of their employment with the Philadelphia Police Department deprived Mr. Walker of his clearly established constitutional right to due process of law and to a fair trial by fabricating inculpatory evidence and deliberately using coercion and/or suggestion to obtain inculpatory witness statements, including without limitation the false statements of witnesses.

118.    The individual Defendants deprived Mr. Walker of his right to a fair trial by intentionally withholding, concealing and/or suppressing material exculpatory and impeachment evidence, as previously described herein.

119.    The individual Defendants deprived Mr. Walker of his right to a fair trial by deliberately failing to conduct a constitutionally adequate investigation, including without limitation by failing to obtain complete witness statements and conduct a complete investigation.

120.    The individual Defendants performed the above-described acts under color of state law, intentionally, with reckless disregard for the truth, and with deliberate indifference to Mr. Walker's clearly established constitutional rights.  No reasonable officer in 1995-1997 would have believed this conduct was lawful.

121.    Defendants' acts and omissions, as described in the preceding paragraphs, were the direct and proximate cause of Mr. Walker's injuries.  Defendants knew, or should have known, that their conduct would result in Mr. Walker's wrongful arrest, prosecution, conviction, and incarceration.

## COUNT II
### 42 U.S.C. § 1983 Civil Rights Conspiracy
### (Against All Individual Defendants)

122.    The preceding paragraphs are incorporated by reference as though fully set forth herein.

123.    The individual Defendants, acting within the course and scope of their employment and under color of state law, agreed among themselves and with other individuals to act in concert in order to deprive Mr. Walker of his clearly established Fourth, Fifth, and Fourteenth Amendment rights to be free from unreasonable searches and seizures, false arrest,

false imprisonment, malicious prosecution, deprivation of liberty without due process of law, and

his right to a fair trial.

124.    In furtherance of the conspiracy, the Defendants engaged in and facilitated

numerous overt acts, including, without limitation, the following:

      a.    Suggesting, coercing, and/or fabricating inculpatory evidence in the form of
          witness statements;

      b.    Intentionally or with deliberate indifference failing to comply with their duty to
          disclose *Brady* and impeachment material during the pendency of the case; and

      c.    Committing perjury during hearings and trials.

125.    Defendants' acts and omissions, as described in the preceding paragraphs, were

the direct and proximate cause of Mr. Walker's injuries.  Defendants knew, or should have

known, that their conduct would result in Mr. Walker's wrongful arrest, prosecution, conviction,

and incarceration.

## COUNT III
### 42 U.S.C. § 1983 Municipal Liability Claim
### (Against Defendant City of Philadelphia)

126.    The preceding paragraphs are incorporated by reference as though fully set forth

herein.

127.    The City of Philadelphia, by and through its final policymakers, had in force and

effect during the time of Mr. Walker's wrongful arrest and conviction, and for many years

preceding and following this investigation, a policy, practice, or custom of unconstitutional

misconduct in homicide and other criminal investigations, including in particular the use of

coercive techniques in interviews and interrogations to obtain confessions; the fabrication of

inculpatory evidence; the fabrication of incriminating statements from witnesses, suspects, and

arrestees by coercion, suggestion, and feeding details about the crime; and the withholding of exculpatory evidence.

128.    Final policymakers for the City of Philadelphia had actual or constructive notice of these practices, policies, and customs, but repeatedly failed to make any meaningful investigation into charges that homicide detectives were using coercive techniques in interviews and interrogations to obtain confessions; withholding exculpatory evidence; fabricating inculpatory evidence; and, particularly, fabricating incriminating statements from witnesses, suspects, and arrestees by coercion, suggestion, and feeding details about the crime, and failed to take appropriate remedial and/or disciplinary actions to curb this pattern of misconduct.

129.    Mr. Walker's injuries and damages were further proximately caused by policies and practices on the part of policymakers with responsibility of administration of the District Attorney's office to allow the withholding of exculpatory and/or inconsistent evidence, allow witness to provide false testimony, and to pursue profoundly flawed investigations and prosecutions.

130.    The widespread practices described in the preceding paragraphs, of which the City of Philadelphia had actual or constructive notice, were allowed to flourish because the Police Department and District Attorney's office declined to implement sufficient training and/or any legitimate mechanisms for oversight or punishment.

131.    Such unconstitutional municipal customs, practices, and/or policies were the moving force behind Mr. Walker's arrest, prosecution, and conviction and over 28 years of incarceration, as well as all the other injuries and damages set forth above.

## **PUNITIVE DAMAGES**

132.    The preceding paragraphs are hereby incorporated by reference as though fully set forth herein.

133.    The conduct of the individual Defendants was outrageous, malicious, wanton, willful, reckless, and intentionally designed to inflict harm upon Plaintiff.

134.    As a result of the acts of the Defendants alleged in the preceding paragraphs, Plaintiff is entitled to punitive damages.

**WHEREFORE**, Plaintiff requests the following relief:

a.    That the Court award compensatory damages to Plaintiff and against all Defendants, jointly and severally, in an amount to be determined at trial;

b.    That the Court award punitive damages to Plaintiff, and against all individual Defendants in their individual capacity, in an amount to be determined at trial, that will deter such conduct by Defendants in the future;

c.    A declaratory judgment that the practices and policies complained of are unconstitutional;

d.    For pre-judgment and post-judgment interest and recovery of Plaintiff's costs, including reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 for all 42 U.S.C. § 1983 claims; and

e.    For such other and further relief as appears reasonable and just.

Respectfully, submitted,

MARRONE LAW FIRM, LLC

By: ___/s/Michael Pomerantz_____

Michael D. Pomerantz, Esquire
Pa. Attorney ID No. 83415
200 South Broad, Ste. 610
Philadelphia, PA. 19102
(215) 732-6700 – Phone
(215) 732-7660 – Fax
pgreenfeld@marronelaw.com
mpomerantz@marronelaw.com

Attorneys for Plaintiff

Date: August 31, 2025