IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| GARY WALKER,<br><br>Plaintiff,<br><br>v.<br><br>CITY OF PHILADELPHIA, et al.,<br><br>Defendants. | CIVIL ACTION<br>NO. 25-5002 |

**OPINION**

**Slomsky, J.**                                                                                    **July 9, 2026**

## I.      INTRODUCTION

Before the Court is Defendant Detective Frank Jastrzembski's Motion to Dismiss concerning the two counts of Plaintiff's Complaint.  (See Doc. No. 19.)  Plaintiff Gary Walker ("Plaintiff") was convicted of the murder of William Hamlin in July 1997.  In 2023, after spending more than 28 years in prison, his conviction for first-degree murder was vacated.  With his conviction vacated, Plaintiff brought this action in which he asserts several claims for violations of his constitutional rights under 42 U.S.C. § 1983 ("Section 1983") against the City of Philadelphia and several individual defendants who were detectives in the Philadelphia Police Department.  Presently before the Court is Defendant Detective Jastrzembski's Motion to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6).  For the following reasons, the Court will grant the Motion to Dismiss.[1]

---

[1]  The remaining Defendants in this case—the City of Philadelphia and Detectives Arthur Mee, James Dougherty, Maria DiBlasi, and Edward Rocks—filed an Answer to the Complaint.  (See Doc. No. 16.)

1

## II.    BACKGROUND

### A. Factual Background

When ruling on a motion to dismiss, a court must accept all well-pleaded facts in the complaint as true. Ashcroft v. Iqbal, 556 U.S. 662, 663 (2009). The facts relevant to the underlying motion to dismiss are summarized as follows:

### 1.    Murder of William Hamlin

On December 13, 1995, emergency services began receiving calls about a shooting involving several black males that occurred on the 2100 block of North 7th Street in North Philadelphia. (Doc. No. 1 ¶30.) The shooting resulted in the death of William Hamlin ("Hamlin"). (Id.) By the time the police arrived at the scene, which was located a few doors down from a barbershop, they were told that Hamlin had already been taken to the hospital by bystanders. (Id. ¶31.) At the scene, the police observed twenty-four fired cartridge casings of different calibers. (Id. ¶32.)

Police located Hamlin at Girard Medical Center before he was sent to Jefferson Hospital where he was pronounced dead. (Id. ¶ 33.) Hamlin sustained three gunshot wounds, one of which was a fatal wound to the left lower back. Police later determined that Hamlin was shot with bullets that came from multiple guns. (Id.)

Police were then notified of another shooting victim who was at St. Joseph's Hospital— located about ten blocks from the crime scene—who they determined was Plaintiff Gary Walker ("Plaintiff"). (Id. ¶ 34.) While in Plaintiff's hospital room, Detectives DiBlasi, Baker and McGee observed that Plaintiff had been shot in the leg, and Detective DiBlasi took Plaintiff's clothes from him. (Id. ¶ 35.) The police never produced any results of testing on the clothes, which Plaintiff alleges could have been exculpatory evidence for him. (Id.) The next day, Plaintiff was discharged from the hospital. (Id. ¶ 36.)

After police arrived at the shooting scene, they took the three men working that afternoon at the barbershop near where Hamlin was shot—Mitchell Pearce, Reginald Hale, and William Benjamin—down to the Police Administration Building (PAB), Homicide Division, for questioning. (Id. ¶ 37.)  Detective Mee interviewed Pearce. (Id. ¶ 38.)  Detective Dougherty interviewed Hale, who testified at trial that Detective Dougherty coerced him into identifying Walker out of an array of photos by using intentionally suggestive techniques, such as pointing out which photo the Detective wanted him to select. (Id. ¶¶52, 62.) Detective Maria DiBlasi interviewed Benjamin. (Id. ¶63.)

### 2.    Witness Lorenzo Andrews' Statement and Trial Testimony

On December 14, 1995, the day after the homicide, Defendant Detective Jastrzembski ("Detective Jastrzembski") took the statement of Lorenzo Andrews', another person in the barbershop, at his mother's house. (Id. ¶¶66–67.)  Andrews' version of events was as follows.  In the afternoon of December 13, 1995, Andrews was in the barbershop with Hamlin and barbers Pearce, Hale, and Benjamin when Plaintiff appeared holding a 9mm gun in his hand asking to speak with Hamlin. (Id.)  Next, Hamlin, Plaintiff, and Andrews exited the barbershop. (Id.)  While Andrews was talking to the driver of a Jeep parked outside the barbershop, Hamlin and Plaintiff walked up the street about two or three houses away. (Id.)  Then, after Andrews heard seven to eight gunshots coming from their direction, he turned around to witness Plaintiff holding Hamlin against the wall and shooting him, before Hamlin fell to the floor. (Id.)  Following the shooting, Plaintiff fled and Andrews began running to Hamlin when the two boys in the Jeep started shooting in his direction. (Id.)  A girl from the neighborhood took Hamlin to the hospital. (Id. ¶68.)  Andrews claimed that neither he nor Hamlin had a gun at any time that day.  Andrews denied knowing anything about why the shooting occurred. (Id. ¶69.)

3

On December 15, 1995, Detective Jastrzembski swore out an affidavit of probable cause for the arrest of Plaintiff for the murder of Hamlin. Andrews' statement was the sole evidence relied on by the police in the affidavit of probable cause. (Id. ¶70.)

On July 2, 1997, the first day of Plaintiff's trial, Andrews testified as the Commonwealth's only eyewitness that he saw Plaintiff shoot Hamlin. In his trial testimony, Andrews allegedly made the following additions to his December 1995 statement: (1) the name of the Jeep Cherokee driver was "Bernie;" (2) he saw Plaintiff hold the gun within one foot of Hamlin and shoot Hamlin just above his right hip; (3) he could tell it was a 9mm gun by the sound of the shots; and (4) he and Hamlin were very close friends. (Id. ¶71.) Plaintiff alleges that Andrews' testimony diverged from his December 1995 statement. While Andrews testified at trial that he heard about five shots when he was talking to Bernie, he had previously stated that he heard seven to eight shots. (Id. ¶72.)

Plaintiff asserts that Andrews' testimony that Plaintiff shot Hamlin at close range was contradicted by the Medical Examiner, who testified there was no evidence that Hamlin was killed at close range. (Id. ¶85.) Plaintiff further asserts that Andrews' testimony that only Plaintiff's gun was used that day, and that neither he nor Hamlin were armed or shot a gun that day was contradicted by the Commonwealth's ballistic expert who testified that three to five guns were used that day. (Id. ¶¶32, 85.)

### 3.    Defendant Detective Jastrzembski's Testimony

At Plaintiff's trial, Detective Jastrzembski testified that ever since Andrews described his interactions with the Jeep driver, Jastrzembski was interested in finding the driver because he was a witness to and could have been involved in the crime. (Id. ¶76.) He also testified that the police searched for the vehicle but never found it. (Id.) Detective Jastrzembski also said that he

4

did not feel a need to re-interview Andrews at a later date in order to identify the driver of the vehicle or to obtain any additional information from him.  (Id. ¶78.)

In response to being asked whether it would have been helpful if Andrews had told him the Jeep driver's name was "Bernie," Detective Jastrzembski said that it would not have likely helped him identify the driver.  (Id. ¶79.)

Plaintiff alleges here that documents produced to Plaintiff in his underlying PCRA proceedings in 2021 revealed that Detective Jastrzembski and other detectives had identified the full name of the driver as "Bernard Sanford," investigated and obtained his criminal history, and interviewed an inmate whom Bernie had visited in jail just one month after the murder, wherein Bernie relayed his account of the shootings and what led up to them more than a year before Plaintiff's trial.  (Id. ¶80.)  Specifically, police withheld Bernie Sanford's printed criminal record, which revealed his convictions for multiple firearms and possession of a controlled substance offense in 1992, 1993, and 1994.  (Id. ¶81.)

Plaintiff further alleges that the police withheld notes taken by Detectives Graebs and Rocks on April 2, 1996, summarizing statements made by Steven Mickens ("Mickens"), an inmate whom Bernie visited in prison in January 1996, in which Bernie explained what led to the shootout and what happened as a result.  (Id. ¶82.)  Specifically, Mickens explained Bernie's recall of what happened as follows.  After Hamlin had sold Bernie some bad drugs, he was driving around with Plaintiff and a man named "Marvin" in his white Jeep when they saw Hamlin outside the barbershop.  (Id.)  Next, Plaintiff and Hamlin started to argue, and Hamlin came over to tell Bernie that he would never sell bad drugs.  (Id.)  Plaintiff and Hamlin then both pulled out their guns, Plaintiff started shooting, Hamlin shot Plaintiff in the leg, Hamlin was

lying on the ground, and then Bernie took Plaintiff to the hospital.  (Id.)  Mickens provided the detectives with Bernie's full name and address.  (Id.)

On July 7, 1997, Plaintiff was convicted of first-degree murder and possession of an instrument of a crime and was sentenced to life imprisonment.  (Id. ¶12.)

### B.  Procedural Background

On September 1, 2023, Plaintiff's petition seeking relief in Pennsylvania state court pursuant to the Post-Conviction Release Act ("PCRA") was granted, and his conviction for first-degree murder and accompanying life sentence were vacated.  (Id. ¶14.)  On that same date, Plaintiff accepted a negotiated guilty plea to third-degree murder, which carried a sentence of twenty to forty years. In July 2024, Plaintiff was released from prison.  Plaintiff then commenced the instant action against the City and the officers involved in the 1995 investigation of his case.

The Complaint contains three Counts, all of which are grounded on 42 U.S.C. § 1983. Count I asserts a claim against all of the individual Defendants for deprivation of liberty without due process of law and denial of a fair trial.  Count II asserts a civil conspiracy claim against all of the individual Defendants.  Count III asserts a municipal liability claim against the City pursuant to Monell v. Dep't of Social Servs., 436 U.S. 658 (1978).

On January 16, 2026, Detective Jastrzembski filed a Motion to Dismiss.  (Doc. No. 19.) On January 30, 2026, Plaintiff filed a Response in Opposition.  (Doc. No. 21.)  On February 17, 2026, the Court entered an Order scheduling a hearing on Detective Jastrzembski's Motion to Dismiss.  (Doc. No. 26.)

On March 20, 2026, Detective Jastrzembski filed a Motion for Leave to File a Reply. (Doc. No. 28).  On March 27, 2026, Plaintiff filed a Response in Opposition to Defendant Detective Jastrzembski's Motion for Leave.  (Doc. No. 29.)

On April 1, 2026, the Court held a hearing on Detective Jastrzembski's Motion to Dismiss. On April 2, 2026, the Court entered two Orders: (1) granting the parties leave to file supplemental memorandum in support of or in opposition to Detective Jastrzembski's Motion to Dismiss; and (2) granting Defendant Detective Jastrzembski's Motion for Leave to File a Reply. (Doc. Nos. 30, 31.) On June 11, 2026, Plaintiff filed his Supplemental Memorandum. (Doc. No. 35.) The Motion is now ripe for disposition.

## III.    STANDARD OF REVIEW

The motion to dismiss standard under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim is set forth in Ashcroft v. Iqbal, 556 U.S. 662 (2009). After Iqbal it is clear that "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to defeat a Rule 12(b)(6) motion to dismiss. Id. at 678; see also Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007). "To survive dismissal, 'a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" Tatis v. Allied Interstate, LLC, 882 F.3d 422, 426 (3d Cir. 2018) (quoting Iqbal, 556 U.S. at 678). Facial plausibility is "more than a sheer possibility that a defendant has acted unlawfully." Id. (quoting Iqbal, 556 U.S. at 678). Instead, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. (quoting Iqbal, 556 U.S. at 678).

Applying the principles of Iqbal and Twombly, the Third Circuit Court of Appeals in Santiago v. Warminster Township, set forth a three-part analysis that a district court in this Circuit must conduct in evaluating whether allegations in a complaint survive a Rule 12(b)(6) motion to dismiss:

> First, the court must "tak[e] note of the elements a plaintiff must plead to state a claim." Second, the court should identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth." Finally, "where

7

there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief."

629 F.3d 121, 130 (3d Cir. 2010) (alteration in original) (quoting Iqbal, 556 U.S. at 675, 679). The inquiry is normally broken into three parts: "(1) identifying the elements of the claim, (2) reviewing the complaint to strike conclusory allegations, and then (3) looking at the well-pleaded components of the complaint and evaluating whether all of the elements identified in part one of the inquiry are sufficiently alleged." Malleus v. George, 641 F.3d 560, 563 (3d Cir. 2011).

A complaint must do more than allege a plaintiff's entitlement to relief, it must "show" such an entitlement with its facts. Fowler v. UPMC Shadyside, 578 F.3d 203, 210-11 (3d Cir. 2009) (citing Phillips v. Cnty. of Allegheny, 515 F.3d 224, 234-35 (3d Cir. 2008)). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" Iqbal, 556 U.S. at 679 (second alteration in original) (citation omitted). The "plausibility" determination is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Id.

## IV.    ANALYSIS

Defendant seeks dismissal of the three theories of liability set out in the Complaint against him.[2] The Court will address each of Defendant's argument individually. Defendant's arguments, and the Court's conclusions, are as follows:

- (A) On Count I, Defendant seeks dismissal of the Fourteenth Amendment claim based on a theory that he Withheld Material Exculpatory and Impeachment

---

[2] Originally, Plaintiff's Complaint included a Fourteenth Amendment theory of Deliberately Failing to Conduct a Constitutionally Adequate Investigation. (See Doc. No. 1 at.) However, at the Motion to Dismiss hearing held on April 1, 2026, Plaintiff's counsel stated that the inadequate investigation claim was withdrawn. Therefore, the Court need not address it here.

Evidence. The Court will dismiss Count I to the extent it relies on the Fourteenth Amendment because Defendant Detective Jastrzembski is entitled to qualified immunity on this claim.

- (B) On Count I, Defendant seeks dismissal of the Fourteenth Amendment claimed based on a theory that he Fabricated Evidence. The Court will dismiss Count I to the extent that it relies on the Fourteenth Amendment because Plaintiff has not sufficiently demonstrated that Lorenzo Andrews' testimony was fabricated.

- (C) On Count II, Defendant seeks dismissal of the Fourteenth Amendment claim based on a theory that he was a part of a Civil Conspiracy.  The Court will dismiss Count II in its entirety.

A.  **Withholding of Material Exculpatory and Impeachment Evidence (Count I)**

1.  **Plaintiff Pleads a <u>Brady</u> Claim, Not a Deliberate Deception Claim**

As an initial matter, the Court must determine whether Plaintiff pleads a <u>Brady</u> claim or a deliberate deception claim in Count I.  This distinction matters because if Plaintiff is alleging a <u>Brady</u> claim, Defendant would be entitled to qualified immunity.  The Third Circuit decision in <u>Dennis v. City of Philadelphia</u> provides helpful guidance in distinguishing these two claims:

> A <u>Brady</u> claim, in essence, is a claim by a defendant that []his due process rights were violated by the failure to disclose exculpatory or impeachment evidence to the defense, while a claim for deliberation deception in violation of due process must go beyond the failure to disclose evidence and arises when imprisonment results from the knowing use of false testimony or other fabricated evidence or from concealing evidence to create false testimony to secure a conviction.  To be clear, a deliberate deception claim against police officers and a <u>Brady</u> claim are not conterminous.  In other words, a plaintiff alleging a claim against police offices for violation of due process rights by deliberate deception to the court need not bring a <u>Brady</u> claim.  Yet, to survive the qualified immunity defense, the claim must involve a right with sufficiently clear contours that every reasonable officer would have understood that what he is doing violates that right—and a generalized notion that deliberate deception violates due process will not do.

19 F.4th 279, 291 (3d Cir. 2021).

9

This boundary was further analyzed by the court in <u>Natividad v. Raley, et al.</u> as follows:

> [T]o survive qualified immunity, a deliberate-deception claim must allege some form of 'Brady-plus' misconduct: some action(s) that concealed or suppressed evidence, plus the specific intent to deceive the court and jury in order to secure a conviction, rather than an intent to 'merely' conceal or withhold exculpatory evidence.

No. 225-cv-5601, 2025 WL 1550740, at *9 (E.D. Pa. May 20, 2025) (citing <u>Dennis v. City of Philadelphia</u>, 19 F.4th 279, 291 (3d Cir. 2021). In <u>Natividad</u>, the Court classified the nature of Plaintiff Natividad's claim as one of deliberate deception because he "did not limit his deliberate deception claim to a mere failure to disclose; instead, he claims the detectives violated his due process rights to a fair trial by concealing and/or suppressing relevant and material evidence as apart of a larger scheme to deliberately deceive the court and frame him for murder." 2025 WL 1550740, at *9 (internal quotations omitted). In short, a <u>Brady</u> claim challenges the failure to disclose favorable evidence, whereas a deliberate deception claim requires more.

Applying that rationale here, the allegations in the Complaint do not extend beyond the asserted suppression of exculpatory and impeachment evidence. Plaintiff does not plausibly allege that Defendant Detective Jastrzembski knowingly used false testimony at trial, concealed evidence to manufacture false testimony, or otherwise engaged in the type of affirmative deception described in <u>Dennis</u>. Instead, Plaintiff allegations in Count I are that: "[t]he Individual Defendants deprived [Plaintiff] of his right to a fair trial by intentionally withholding, concealing and/or suppressing material exculpatory and impeachment evidence." What's more, Plaintiff in his Response in Opposition argues that his Complaint satisfied the pleading requirements of a <u>Brady</u> claim, further

10

demonstrating the nature of his claim.[3] (See Doc. No. 21 at 7.) Accordingly, the Court will analyze Plaintiff's allegations in Count I under the Brady framework.

### 2. Defendant Detective Jastrzembski is Entitled to Qualified Immunity

Government officials are immune from personal liability for civil damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). To determine whether an officer is entitled to a qualified immunity defense, a court must conduct a two-step inquiry: (1) whether the facts "make out a violation of a constitutional right;" and (2) whether the right was "clearly established" at the time of the alleged misconduct. Pearson v. Callahan, 555 U.S. 223, 232 (2009). These questions can be addressed in either order. Id. at 236. The Court must view the facts "in the light most favorable to the party asserting the injury." Scott v. Harris, 550 U.S. 372, 377 (2007). The burden of establishing entitlement to qualified immunity lies with the officer claiming its protection. Reedy v. Evanson, 615 F.3d 197, 223 (3d Cir. 2010).

For qualified immunity purposes, the second part of the inquiry—whether the right was "clearly established"—requires the court to "conclude that the firmly settled state of the law, established by a forceful body of persuasive precedent, would place a reasonable official on notice

---

[3]  To the extent Plaintiff argues that he has pled a deliberate deception claim, the argument lacks persuasive force. In his Supplemental Memorandum, Plaintiff cites extensively to Waller v. City of Philadelphia, No. 24-cv-2235, 2026 WL 914939, at *8–9 (E.D. Pa. Mar. 30, 2026), in support of his position that Count I is not simply a Brady claim. (Doc. No. 35 at 3.) But the Court's holding in Waller is irrelevant to this Court's determination whether Plaintiff's claim is a Brady or deliberate deception claim. In Waller, the court declined to construe Plaintiff's allegation exclusively as a Brady claim and instead found that Plaintiff was asserting a broader Fourteenth Amendment claim for fabrication of evidence. Id. at *9.

Here, the Court does not construe Plaintiff's allegations in Count I as exclusively a Brady claim, but also as a fabrication of evidence claim, which is analyzed more fully infra. Therefore, Plaintiff's reliance on Waller is misplaced because in Waller the court did not address the boundary between a claim for deliberate deception and a Brady claim.

that his actions obviously violated a clearly established constitutional right." Spady v. Bethlehem Area Sch. Dist., 800 F.3d 633, 639 (3d Cir. 2015) (citations omitted).

Here, Detective Jastrzembski argues that he is entitled to qualified immunity for allegedly withholding "several pieces of evidence from the D.A. and from [Plaintiff]" because Plaintiff's asserted right was not clearly established during the relevant period. (Doc. No. 19 at 11.) In his Opposition, Plaintiff contends that Detective Jastrzembski deprived him of his Fourteenth Amendment due process right to a fair trial by intentionally withholding, concealing, and/or suppressing material exculpatory and impeachment evidence in violation of Brady v. Maryland, 373 U.S. 83, 87 (1963). (Doc. No. 21 at 7.) Specifically, Plaintiff alleges that Detective Jastrzembski withheld the identity of the Jeep driver, Bernard Sanford, and the statement of Steven Mickens whom Sanford visited in prison after the incident. (Id. at 10–12.) In support of his argument, Plaintiff relies on Gibson v. Superintendent of NJ Dept. of Law and Public Safety-Division of State Police, et al., for the proposition that "[p]olice officers can violate a defendant's due process rights by 'affirmatively conceal[ing] material [exculpatory] evidence from the prosecutor.'" (Id. at 9) (citing Gibson, 411 F.3d 427, 443 (2005)). Plaintiff's reliance on Gibson is misplaced for the following two reasons.

First, the duty to disclose exculpatory evidence to the defendant under Brady applies only to the prosecutor. Gibson, 411 F.3d at 442–43. The United States Supreme Court decision in Brady v. Maryland established a prosecutor's obligation to turn over favorable evidence to an accused, and that failure to do so "violated due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. And while the prosecutor's obligation extended to learning of favorable evidence possessed by the police officers involved, the Court recognized that "the police are not equipped to perform

12

[the] [prosecutor's] role" and refused to "substitute the police for the prosecutor." Gibson, 411 F.3d at 443 (citing Kyles v. Whitley, 514 U.S. 419, 421–22 (1995)). As such, Detective Jastrzembski had no duty to disclose any evidence to Plaintiff.

Second, at the time of Plaintiff's conviction, the right to the disclosure of evidence in the hands of the police was not clearly established. While the Third Circuit in Gibson recognized that police officers could be liable under § 1983 for failing to turn over evidence to the prosecutor in a criminal proceeding, the Circuit explained that such a right has not previously been clearly established. 411 F.3d at 444 ("Even in 2000, this Court was only able to assume that police officers 'have an affirmative duty to disclose exculpatory evidence to an accused if only by informing the prosecutor that the evidence exists'") (citing Smith v. Holtz, 210 F.3d 186, 197 n. 14 (3d Cir. 2000)). In the present case, Plaintiff was not convicted until July 7, 1997—years before the Gibson decision in 2005. (Doc. No. 1 at 3.) Therefore, Defendant Detective Jastrzembski is entitled to qualified immunity because Plaintiff's right to the disclosure of evidence was not clearly established at the time of his investigation and prosecution. See Johnson v. City of Rading, 2025 WL 3565686, at *8 (E.D. Pa. Dec 12. 2025); Stokes v. City of Philadelphia, 2023 WL 362006, at *5 (E.D. Pa. Jan. 23, 2023); Outlaw v. City of Philadelphia, 2021 WL 3471168, at *6 (E.D. Pa. Aug. 6, 2021); Lewis v. City of Philadelphia, 2020 WL 1683451, at *10 (E.D. Pa. Apr. 6, 2020).

Accordingly, Defendant Detective Jastrzembski's Motion to Dismiss Count I for allegedly withholding material exculpatory and impeachment evidence will be granted.

### B. Fabrication of Evidence (Count I)

Defendant Detective Jastrzembski has also moved to dismiss Plaintiff's fabrication-of-evidence claim. Where a government official fabricates evidence to secure a conviction, a criminal defendant "has a stand-alone claim" for fabrication of evidence "if there has been a reasonable likelihood that, without the use of [fabricated] evidence, the defendant would not

13

have been convicted." Thomas v. City of Philadelphia, 290 F. Supp. 3d 371, 383 (citing Halsey v. Pfeiffer, 750 F.3d 273, 294 (3d Cir. 2014)).

In Count I of his Complaint, Plaintiff alleges that Defendant Detective Jastrzembski fabricated evidence and deliberately used coercion and/or suggestion to obtain inculpatory witness statements, including without limitation the false statements of witnesses. (Doc. No. 1 ¶117.) Specifically, Plaintiff alleges that Defendant Detective Jastrzembski "fabricat[ed] false, inculpatory evidence in the form of creating testimony for Andrews to testify to a made-up story about what he saw on December 13, 1995." (Id. ¶88.)

Defendant Detective Jastrzembski argues that the Complaint does not provide factual support for the allegation that Detective Jastrzembski "directed, encouraged, or knowingly acquiesced" in Andrew's testimony, but rather demonstrates that Andrew's statement was inconsistent with his trial testimony, which is not equivalent to fabrication. (Doc. No. 19 at 14–15) (citing Cf. Coulston v. City of Philadelphia, 2025 WL 2377676, at *12 (E.D. Pa. Aug. 15, 2025)). The Court agrees.

Plaintiff has not sufficiently demonstrated that Andrew's statement was fabricated. For evidence to be considered fabricated, "[t]here must be 'persuasive evidence supporting a conclusion that the proponents of the evidence' are aware that the evidence is incorrect or that the evidence is offered in bad faith." Thomas v. City of Philadelphia, 290 F. Supp. 3d 371, 383–84 (citing Black v. Lower Merion Twp., 835 F.3d 358, 372 (3d Cir. 2016)). Here, the allegations in the Complaint merely state that Andrew's testimony at trial diverged from his original statement because instead of hearing seven to eight gunshots, as he said in his original statement to Detective Jastrzembski, he testified at trial that he heard five gunshots. (Doc. No. 1 ¶72.) Plaintiff further alleged that Andrew's testimony that Plaintiff shot Hamlin at close range and

that no one else fired a gun in the shootout was contradicted by the Medical Examiner and ballistic evidence at trial.  (Id. ¶85.)  But the Complaint does not provide factual support, only conclusory allegations, that Detective Jastrzembski played a role in creating or knowingly presenting false evidence.  These allegations do not rise to the "notable bar" set for evidence fabrication claims because "testimony that is incorrect or simply disputed should not be treated as fabricated merely because it turns out to have been wrong."  Halsey, 750 F.3d 295.

Therefore, even when viewing the allegations in the Complaint in the light most favorable to Plaintiff, the Complaint does not support an inference that Defendant Detective Jastrzembski was personally involved in the fabrication of evidence in Plaintiff's case.

### C. Civil Conspiracy (Count II)

In Count II of the Complaint, Plaintiff asserts that Defendant Detective Jastrzembski conspired to deprive him of his Fourth, Fifth, and Fourteenth Amendment rights to be free from unreasonable searches and seizures, false arrest, false imprisonment, malicious prosecution, and deprivation of liberty without due process of law.  (Doc. No. 1 ¶123.)  Count II alleges a series of overt acts of Defendants in furtherance of the conspiracy, including (1) suggesting, coercing, and/or fabricating witness statements; (2) failing to comply with their disclosure obligations under Brady; and committing perjury during hearings and trials.  (Id. ¶124.)  In moving to dismiss this claim, Defendant Detective Jastrzembski argues that the Complaint lacks factual support to state a claim of civil conspiracy upon which relief can be granted.  (Doc. No. 19 at 16–18.)

To plead a plausible § 1983 conspiracy claim, a plaintiff must allege that "two or more conspirators reached an agreement to deprive [the plaintiff] of a constitutional right under color of law."  Parkway Garage, Inc. v. City of Phila., 5 F.3d 685, 700 (3d Cir. 1993) (citing Adickes v.

15

S.H. Kress & Co., 398 U.S. 144, 150 (1970)).  Put differently, the plaintiff must allege and

prove:

> (1) two or more persons conspire to deprive any person of [constitutional rights];
> (2) one or more of the conspirators performs…an overt act in furtherance of the
> conspiracy; and (3) that overt act injures the plaintiff in his person or property or
> deprives the plaintiff of any right or privilege of a citizen of the United States,"
> with the added gloss under § 1983 that "the conspirators act 'under color of state
> law.'"

Rosembert v. Borough of East Lansdowne, 14 F. Supp.3d 631, 647 (E.D. Pa. Apr. 9, 2014)

(citations omitted).

Because the Court has determined that Plaintiff has failed to plausibly allege the

underlying constitutional violations asserted in Count I against Defendant Detective

Jastrzembski, the derivative § 1983 conspiracy claim necessarily fails.[4]  See Stokes, 2023 WL

362006, at *5 (finding that an official who is immune from suit for a § 1983 violation is also

immune from liability for a conspiracy claim based on the same underlying conduct) (citing

Ippolito v. Aherne, No. 14-6077, 2015 WL 6447153, at *6 (E.D. Pa. Oct. 26, 2015)).  Therefore,

Plaintiff's conspiracy claim (Count II) will be dismissed as to Defendant Detective Jastrzembski.

## V.    CONCLUSION

For the foregoing reasons, Defendant Detective Jastrzembski's Motion (Doc. No. 19) will

be granted and all claims against Defendant Detective Jastrzembski will be dismissed.  An

appropriate Order follows.

---

[4]  At the Motion to Dismiss hearing held on April 1, 2026, Plaintiff's counsel agreed with the
notion that if the underlying constitutional violation is dismissed, the conspiracy claim must
also be dismissed.  (See Doc. No. 33 at 31:14–15) ("If the underlying violation goes away, the
conspiracy goes away.")